# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

            v.

MARK RAY; REVA STACHNIW; RON
THROGMARTIN; CUSTOM
CONSULTING & PRODUCT SERVICES,
LLC; RM FARM & LIVESTOCK, LLC;
MR CATTLE PRODUCTION SERVICES,
LLC; SUNSHINE ENTERPRISES;
UNIVERSAL HERBS, LLC; DBC
LIMITED, LLC,

                    Defendants.

Civil Action File No.

## <u>COMPLAINT</u>

Plaintiff, the United States Securities and Exchange Commission

("Commission" or "SEC") alleges the following:

# OVERVIEW

1.     This matter involves a cattle Ponzi scheme perpetrated by Mark Ray and various entities that he controls.  Ray is a repeat offender; he was previously barred by the Illinois Secretary of State from offering securities in that state as the result of a previous cattle business that operated similar to the Ponzi scheme at issue in this case.  Despite the bar, Ray solicited and accepted investments from residents of Illinois in connection with his current Ponzi scheme.

2.     Defendants Custom Consulting & Product Services, LLC ("Custom Consulting"), RM Farm & Livestock, LLC ("RM Farm"), MR Cattle Production Services, LLC ("MR Cattle"), Sunshine Enterprises ("Sunshine"), Universal Herbs, LLC ("Universal Herbs"), and DBC Limited, LLC ("DBC Limited") (collectively the "Ponzi Businesses") are all involved in Ray's fraudulent scheme.  Ray used bank accounts in the names of the majority of the Ponzi Businesses to facilitate the scheme and to deceive investors into believing that Ray was engaged in cattle trading, when, in fact, he was simply using money from new investors to repay prior investors.

3.     Since at least 2014, the Ponzi Businesses raised tens of millions of dollars from investors.  Certain of the investments were purportedly backed by short-term

cattle trading inventories or cattle-trading opportunities that Ray had identified.

Some investors simply loaned Ray money to be used for the Ponzi Businesses

without having the loans tied to particular cattle trades.  Other investors thought

they were financing Ray's various state-licensed marijuana endeavors.  Ray

promised all of these investors high rates of return, usually over short periods of

times.

4.     In fact, Ray and the Ponzi Businesses engaged in little cattle trading, and

significant amounts of the investor money (regardless of which type of investment

the investor thought he or she was making) was simply used in a Ponzi-like

manner.  In addition to making Ponzi payments to old investors, Ray

misappropriated investor money and used it to pay for things like flights on private

jets and his personal expenses.

5.     The Ponzi scheme involved the offer and sale of unregistered securities in

the form of investment contracts and promissory notes that Ray advertised to

investors, some of whom were unsophisticated, primarily through word of mouth.

6.     Reva Stachniw and Ron Throgmartin substantially assisted Ray and the

Ponzi Businesses with the fraudulent scheme.  Stachniw was the owner and

manager of RM Farm and Sunshine Enterprises.  She opened bank accounts in the

names of those businesses, but then she gave Ray permission to use them in whatever manner he wanted.  Despite numerous red flags, Stachniw would sign stacks of blank checks and deliver them to Ray or his employees for use in the scheme.  She was also the signatory of many of the promissory notes sold as part of the scheme.  Without Stachniw's help, Ray would not have been able to run and grow the Ponzi scheme, because his bank accounts would have been shut down.

7.     Throgmartin drafted invoices and emails reflecting non-existent cattle trades and sent them to investors.  Throgmartin had online access to bank accounts in the names of Ray, Custom Consulting and MR Cattle, all of which were used in the Ponzi scheme, and with the assistance of Stachniw and an outside accountant, he tracked the status of each investor's account.  Without Throgmartin to keep him organized and communicate with investors, Ray could not have succeeded in running the Ponzi scheme.

8.     In March 2019, Ray and the Ponzi Businesses ran out of money and the Ponzi scheme appears to have collapsed.  They do not currently own any cattle as far as the Commission has been able to discover, and investors have lost millions of dollars.  As far as the Commission is aware, the only real assets that remain consist of Ray's marijuana production and distribution operation, which is

licensed by the state of Colorado to Universal Herbs.   And that business is substantially encumbered by debt to taxing authorities, vendors and contractors.

9.    With Ray's history of misappropriating funds, millions of dollars' worth of investor losses, and the nature of the fraud, it is imperative that the Defendants be enjoined against further violation and that the assets derived from the scheme be frozen.

## VIOLATIONS

10.   The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [ 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

11.   The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)].

12.   The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## JURISDICTION AND VENUE

13.   The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v  and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties and for other equitable relief.

14.   This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15. Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

16. Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the District of Colorado.

17. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## THE DEFENDANTS

18. **Mark D. Ray** is a 59 year old resident of Denver, Colorado. Ray is the founder and owner of Custom Consulting, Universal Herbs and MR Cattle. In 2005, Ray was barred from selling securities in Illinois by the Illinois Secretary of State as a result of his offer and sale of securities purportedly backed by cattle trading.

19. **Ron Throgmartin** is a 55 year old resident of Buford, Georgia. He is the CEO of a marijuana business named Diego Pellicer. Diego Pellicer has

publicly traded stock and has licensed retail locations in Denver and Seattle. Throughout the time period described in this Complaint, Throgmartin served as Ray's comptroller and general business consultant.

20. **Reva Stachniw** is a 67 year old resident of Galesburg, Illinois. Ms. Stachniw is a retired nurse. She was the owner and manager of RM Farm and Sunshine. Stachniw opened and controlled bank accounts in the names of RM Farm and Sunshine.

21. **Custom Consulting and Product Services, LLC** is a Colorado limited liability company with its principal place of business in Aurora, Colorado. Custom Consulting is controlled by Ray. Ray used Custom Consulting to solicit investments purportedly backed by cattle trading and by wholesale marijuana transactions. Ray controlled bank accounts in the name of Custom Consulting and used them to receive money from and send money to victims of the Ponzi scheme.

22. **RM Farm and Livestock, LLC** is an Illinois limited liability company with its principal place of business at Stachniw's residence in Galesburg, Illinois. Ray and Stachniw used RM Farm to solicit investments purportedly backed by cattle trading and by Ray's marijuana operations. Ray and Stachniw

used a bank account in the name of RM Farm to receive money from and to send money to the victims of the Ponzi scheme.

23.   **MR Cattle Production Services, LLC** is a Colorado limited liability company with its principal place of business in Denver, Colorado.  MR Cattle is controlled by Ray.  Ray used MR Cattle to solicit investments purportedly backed by cattle trading. Ray controlled bank accounts in the name of MR Cattle and used them to receive money from and send money to victims of the Ponzi scheme.

24.   **Sunshine Enterprises** is a business name used by Stachniw with a principal place of business at Stachniw's residence in Galesburg, Illinois. Ray and Stachniw used a bank account in the name of Sunshine to receive money from and send money to the victims of the Ponzi scheme.  Sunshine's bank account was also used to fund the operations of Universal Herbs.

25.   **Universal Herbs, LLC** is a Colorado limited liability company with its principal place of business in Denver, Colorado.  Universal Herbs is a marijuana business with two licensed retail locations in Denver, along with a separate licensed marijuana production facility.  Ray owns and controls

Universal Herbs.  Ray extensively commingled the assets of Universal Herbs and the other Ponzi Businesses.

26.  **DBC Limited, LLC** is a Colorado limited liability company with its principal place of business in Aurora, Colorado.  Ray owns and controls DBC Limited.  Shortly before the Ponzi scheme collapsed, Ray solicited at least one investment through DBC Limited.  That investment was purportedly to finance a wholesale transaction in CBD oil, a derivative of marijuana.

## THE FRAUDULENT SCHEME

### *Ray Fraudulently Solicits Investments for the Ponzi Scheme*

27.  Beginning in at least 2014, Ray solicited investors for his purported cattle trading and state-licensed marijuana businesses.

28.  Ray promised investors that he would provide them with returns in the range of 10-20% in very short periods of time, usually a few weeks.  Ray told certain of these investors that they were investing in wholesale, commercial cattle trades or wholesale, licensed marijuana transactions.  Other investors were simply asked to invest in promissory notes with a high rate of return.  One investor was told he was financing a wholesale, CBD oil transaction.

29.   Investors in cattle trades were often told specifics about the cattle that Ray would be purchasing with their investment money.  For instance, Ray would tell an investor that he would be purchasing a specific number and type of commercial cattle from a specific ranch.  Ray would also sometimes tell investors that he would send the cattle purchased with their money to a specific feed lot for fattening.  Several of the ranches and feed lots at which Ray told investors he engaged in cattle trading have confirmed to the Commission that they did not engage in any cattle trading with Mr. Ray.

30.   In other words, there were, in fact, no cattle to support the vast majority of purported investments in cattle trading.

31.   Instead, Ray simply used new investor money to repay prior investors.

32.   Similarly, Ray told some investors that they were financing wholesale marijuana transactions whereby he would purchase a large quantity of marijuana from a licensed producer and then sell it at a markup to licensed retailers.

33.   In fact, Ray used most of that investor money to repay prior investors and keep the Ponzi scheme afloat.

34.   Ray also used the proceeds of his promissory note sales to repay prior investors.

35.   Ray instructed some investors to wire money or send checks directly to other victims of his scheme.  When doing so, he would lie to both victims about the purpose of the transfers.

36.   For instance, Ray would instruct Victim A to wire funds to Victim B, telling Victim A that the funds were for the purchase of cattle from Victim B. Ray would tell Victim B, however, that the funds received from Victim A were payment for another cattle trade in which Victim B had previously invested.

37.   Ray had one investor who purchased a promissory note from DBC Limited, which was supposed to finance a wholesale CBD oil transaction, wire the investment money to an attorney in Denver, purportedly to be held in an escrow account.  At this point, the Commission does not know what happened to those funds, and both Ray and the attorney have refused to return the funds to the investor.

38.   Investors would not have invested with Ray had they known that he was using their money to repay earlier investors.

### Ray, Stachniw and the Ponzi Businesses Offered and Sold Unregistered Promissory Notes

39.   Since at least 2016, Ray offered and sold promissory notes to investors through several of the Ponzi Businesses and individually.  The promissory notes are not regulated by any other financial regulatory authority.

40.   Some of the notes were issued in the name of RM Farm and signed by Stachniw.

41.   Other notes were issued in the name of Mark Ray personally or in the name of Custom Consulting, MR Cattle or DBC Limited and signed by Ray.

42.   Some of the notes were convertible into a specific percentage of equity in Universal Herbs.

43.   Most, if not all, of the notes were personally guaranteed by Ray.

44.   The promissory notes that Ray, Stachniw and the Ponzi Businesses offered and sold were not registered with the Commission.

### Ray and the Ponzi Businesses Offered and Sold Unregistered Investment Contracts

45.   Some investors were given formal written contracts or agreements documenting their investments.  Others had oral agreements with Ray and the

Ponzi Businesses that were either undocumented or that were documented in text messages and emails.

46.   All of the agreements called for the investor to make an investment of money with the expectation of profit.

47.   Sometimes the profit was fixed in advance and other times Ray told the investors that the profit would be determined by the final sales price of the cattle or marijuana transaction.

48.   At various times, investors provided funds directly to each of the Ponzi Businesses, except for Universal Herbs and DBC Limited, which did not have bank accounts in their own name so far as the Commission is aware.

49.   At various times, investors received funds directly from each of the Ponzi Businesses, except for Universal Herbs and DBC Limited.

50.   Some investors were told that their investments would be pooled with the funds of other investors for a particular trade.  Others were told that Ray would personally invest his own funds along with theirs.

51.   The investors relied on Ray's skill and knowledge of either the cattle industry or the state-licensed marijuana industry to generate their returns.

52.   Many of the investors knew very little about the cattle industry or the state-licensed marijuana industry.

### The Ponzi Businesses Commingled Funds.

53.   With the exception of Universal Herbs and DBC Limited, the Ponzi Businesses routinely transferred large amounts of money back and forth among their bank accounts using checks and wire transfers.

54.   The vast majority of these transfers did not serve any legitimate business purpose or reflect any underlying economic realities.

55.   Rather, Ray used the various entities and bank accounts to hide his activities and to give the illusion that he was engaged in actual cattle trading or profitably selling state-licensed marijuana.

56.   In general, Ray would have investors send money to accounts controlled by him, with those investors' "returns" coming from accounts controlled by Stachniw, or the opposite.  Ray usually did not both receive and return a particular investor's funds from the same account.

57.   By using accounts in the name of (and nominally controlled by) Stachniw and other accounts controlled by himself, Ray was able to evade detection by the fraud departments of the banks.  In other words, it would have

been obvious to the banks that he was running a Ponzi scheme if all of his activities had run through one account or through accounts only in his own name.   At the height of the scheme, more than $140 million per month was being moved through accounts under the control of Ray and Stachniw.

58.   Stachniw facilitated this deception by, among other things, signing stacks of blank checks drawn on the accounts of Sunshine and RM Farm and giving them to Ray, his investors and his employees.  She further facilitated the deception by making wire transfers from the accounts at Ray's directions.

59.   Stachniw knew or was reckless in not knowing that significant portions of the funds deposited into the account of RM Farm came from investors.  It should have been obvious to her given that she signed the promissory notes issued by RM Farm and had access to the bank account.

60.   Some of the blank checks Stachniw signed were used to pay operating expenses of Universal Herbs.  Those funds mainly came from investors, however, not from any operating profits of Universal Herbs.

61.   Stachniw knew or was reckless in not knowing that she was assisting Ray in a Ponzi scheme.

### Throgmartin Substantially Assisted Ray and Stachniw with the Ponzi Scheme.

62.   Ron Throgmartin, with the assistance of Stachniw, kept track of which investors sent money to which Ponzi Business and vice versa.  He often communicated with investors on behalf of Ray when they had questions about the status of their investments.

63.   Throgmartin also served as the primary drafter of documents used in the Ponzi scheme.  He sent emails, text messages, invoices and promissory notes that he drafted to investors documenting the terms of their investments.

64.   Throgmartin solicited investments in writing from numerous investors on behalf of the Ponzi Businesses.

65.   Throgmartin often instructed investors to which accounts they should send funds.

66.   When the bank at which RM Farm had its accounts became concerned about the volume of transactions in the account, Throgmartin intervened and communicated frequently with the bank president to assuage his concerns.

67.   As part of his effort to keep the account of RM Farm open, Throgmartin sent the bank president a false cattle inventory.

68.   Stachniw was copied on the email sending the false cattle inventory. She knew or was reckless in not knowing that she and RM Farm did not own many of the cattle on the inventory.

69.   In December 2018, Throgmartin also solicited a $5 million investment from an investor on Ray's behalf.  The solicitation was accompanied by a document titled "Consolidated Personal Financial Statement of Mark Ray As of September 30, 2018" that falsely described Ray as having assets worth over $33 million and as having made a "Gross Profit" of $7.8 million from January to September of 2018.  The potential investor ultimately declined to invest.

70.   Throgmartin knew or was reckless in not knowing that Ray had not, in fact, generated any profit in 2018 and that Ray's assets were not worth anywhere near $33 million.

71.   Throgmartin knew or was reckless in not knowing that Ray and Stachniw were running a Ponzi scheme.

### Ray and Stachniw Misappropriated and Misused Investor Funds

72.   Ray used investor funds to pay for personal expenses, such as medical bills, flights on private jets and to support his business of raising show cattle. These payments were made directly from the Ponzi Businesses.

73.   Stachniw paid some of her personal expenses from the accounts of RM Farm and Sunshine.

74.   Ray and Stachniw also simply transferred investor money to their own personal bank accounts (and the accounts of close family members) from the accounts of the Ponzi businesses.

75.   Tens of millions of dollars' worth of investor money is missing and unaccounted for.

76.   Ray has no records of the various cattle transactions he purportedly engaged in, and he does not have sufficient records from which to reconstruct the investors' flow of funds, particularly given that a significant amount of investor funds went directly from one victim to another.

77.   Ray continued to solicit investments after the majority of the Ponzi Businesses' bank accounts were closed.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act

### [15 U.S.C. § 77q(a)(1)]

78.   Paragraphs 1 through 77 are hereby realleged and incorporated herein by reference.

79.   Between in or around 2014 and the present, Ray, RM Farm, Sunshine,

Custom Consulting, MR Cattle and DBC Limited (the "Offering Defendants"), in

the offer and sale of the securities described herein, by the use of means and

instruments of transportation and communication in interstate commerce and by

use of the mails, directly and indirectly, employed devices, schemes and artifices

to defraud purchasers of such securities, all as more particularly described above.

80.   The Offering Defendants knowingly, intentionally, and/or recklessly

engaged in the aforementioned devices, schemes and artifices to defraud.

81.   While engaging in the course of conduct described above, the Offering

Defendants acted with scienter, that is, with an intent to deceive, manipulate or

defraud or with a severely reckless disregard for the truth.

82.   By reason of the foregoing, the Offering Defendants, directly and

indirectly, have violated and, unless enjoined, will continue to violate Section

17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

## Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act

## [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

83.   Paragraphs 1 through 77 are hereby realleged and incorporated herein by reference.

84.   Between in or around 2014 and the present, the Offering Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.   engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

85.   By reason of the foregoing, Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)]and Sections (a), (b), and (c) of Rule 10b-5
### thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)]

86.   Paragraphs 1 through 77 are hereby re-alleged and are incorporated herein by reference.

87.   Between in or around 2014 and the present, Offering Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

   a.   employed devices, schemes, and artifices to defraud;

   b.   made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c.   engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities;

all as more particularly described above.

88.   Offering Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Offering Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

89.   By reason of the foregoing, Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT IV – UNREGISTERED OFFERING OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a), 77e(c)]

90.   Paragraphs 1 through 77 are hereby realleged and are incorporated herein by reference.

91.   Offering Defendants offered and sold securities, including promissory notes and investment contracts.

92.   Offering Defendants used interstate transportation, communication or mails in connection with the sale of securities.

93.   At the time of the offer and sale of securities, no registration statement was in effect as to the securities offered and sold.

94.   By reason of the foregoing, Offering Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT V – AIDING AND ABETTING

95.   Paragraphs 1 through 77 and 78 through 82 are hereby restated and incorporated herein by reference.

96.   Defendants substantially assisted the violations set forth in Count I above.

97.   Defendants knew or were reckless in not knowing that they were participating in securities law violations when assisting, causing or engaging in transactions with or on behalf of the Offering Defendants.

98.   Defendants aided and abetted the violations in Count I above.

## COUNT VI – AIDING AND ABETTING

99.  Paragraphs 1 through 77 and 83 through 85 are hereby restated and incorporated herein by reference.

100.    Defendants substantially assisted the violations set forth in Count II above.

101.    Defendants knew or were reckless in not knowing that they were participating in securities law violations when assisting, causing or engaging in transactions with or on behalf of the Offering Defendants.

102.    Defendants aided and abetted the violations in Count II above.

## COUNT VII – AIDING AND ABETTING

103.    Paragraphs 1 through 77 and 86 through 89 are hereby restated and incorporated herein by reference.

104.    Defendants substantially assisted the violations set forth in Count III above.

105.    Defendants knew or were reckless in not knowing that they were participating in securities law violations when assisting, causing or engaging in transactions with or on behalf of the Offering Defendants.

106.    Defendants aided and abetted the violations in Count III above.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Preliminary and permanent injunctions enjoining Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5] and Sections 5(a), 5(c), 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e, 77q].

### II.

An order requiring an accounting by Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

### III.

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] imposing civil penalties against Defendants.

**IV.**

An order freezing certain assets of Defendants pending further order of the Court.

**V.**

An order preventing Defendants from destroying or concealing documents until further order of this Court.

**VI.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

### JURY TRIAL DEMAND

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 30th day of September, 2019.

Respectfully submitted,

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

/s/ Joshua A. Mayes
Joshua A. Mayes
Senior Trial Counsel
Georgia Bar No. 143107
mayesj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel:(404) 842-7600
Facsimile:  (404) 842-7679